**EXHIBIT "1"**

_____

Declaration of Katherine L. Myrick

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Christopher W. Madel | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 13-cv-02832 |
| | ) (PAM/FLN) |
| | ) |
| Department of Justice and Drug | ) |
| Enforcement Administration, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF KATHERINE L. MYRICK

I, Katherine L. Myrick, hereby make the following Declaration under penalty of perjury pursuant to 28 U.S.C. § 1746. The subject of this declaration and the statements set forth herein are true and correct to the best of my belief either on the basis of my personal knowledge or information acquired by me in the performance of my official duties.

1. I am currently Chief, Freedom of Information (FOI)/Privacy Act Unit, ("SARF"), FOI/Records Management Section ("SAR"), Drug Enforcement Administration ("DEA"), United States Department of Justice ("DOJ"), located at DEA Headquarters in Arlington, Virginia. I have served in this capacity since 1998 and oversee the processing of requests to DEA under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and

1

the Privacy Act ("PA") of 1974, 5 U.S.C. § 552a (cited together "FOI/PA"). SARF is the DEA office responsible for the receipt, processing and release of DEA information requested under the FOI/PA.

2. DEA is a component of the Department of Justice that performs as its principal function activity pertaining to the enforcement of criminal laws, specifically those activities related to the illicit trafficking in controlled substances and chemicals that include the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, *et seq.* See 28 C.F.R. §0.100.

3. DEA's investigative jurisdiction derives from the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, *et seq.*, (hereinafter, the Act) which authorizes DEA to enforce the Act through the investigation of incidences involving the trafficking in controlled substances, dangerous drugs and precursor chemicals and the violators who operate at interstate and international levels; seize and forfeit assets derived from, traceable to, or intended to be used for illicit drug trafficking, cooperate with counterpart agencies abroad and to exchange information in support of drug traffic prevention and control.

4. Due to my experience in responding to requests for DEA records since 1998, and the nature of my official duties, I am familiar with the policies and practices of DEA and DOJ related to searching for, processing, and the release of DEA information responsive to FOI/PA requests.

5. In preparing this declaration, I have read and am familiar with the Complaint in the above titled action.

6. The purpose of this declaration is to provide the Court with information regarding DEA's processing of materials in response to plantiff's FOIA requests dated November 20, 2012, and dated February 5, 2013. This declaration explains the method and scope of the search, the review of responsive records, the release of non-exempt information pursuant to the FOI/PA, and the basis for withholding certain records pursuant to FOIA exemption (b)(4).

## SUMMARY OF CORRESPONDENCE AND ADMINISTRATIVE ACTION

7. By letter dated November 20, 2012, plaintiff stated that his request was:

   a. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding Cardinal Health, Inc.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that Cardinal Health, Inc. distributed the oxycodone to, and the quantity of oxycodone that Cardinal Health, Inc. distributed to that person (in dosage units and grams).

   b. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding CVS Caremark's distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that CVS Caremark distributed the oxycodone to, and the quantity of oxycodone that CVS Caremark distributed to that person (in dosage units and grams).

   c. For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding Walgreen Co.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month

(or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that Walgreen Co. distributed the oxycodone to, and the quantity of oxycodone that Walgreen Co. distributed to that person (in dosage units and grams).

    d.    For each month (or quarter) and year since January 1, 2007, reports ## 1, 2, 3, 4, 5, 6, and 7 from the ARCOS–22 database (in dosage units and grams). The identity and ubstance of these reports can be found at http://www.deadiversion.usdoj.gov/acros/retail_drug_summary/2006/index.html.

A copy of the plaintiff's letter dated November 20, 2012, is attached as Exhibit A.

8. By letter, dated November 29, 2012, DEA acknowledged receipt of plaintiff's request, informing him that his request was assigned DEA FOIA Request No. 13-00105-F, and that his request would be handled in chronological order based on the date of his letter. A copy of DEA's November 29, 2012, letter is attached as Exhibit B.

9. By letter dated February 5, 2013, plaintiff stated that his request was:

    a.    For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding AmerisourceBergen Corp.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that AmerisourceBergen Corp. distributed the oxycodone to, and the quantity of oxycodone that AmerisourceBergen Corp. distributed to that person (in dosage units and grams).

    b.    For each month (or quarter) and year since January 1, 2006, all documents that state and/or include data regarding McKesson Corp.'s distribution of oxycodone to persons located in the State of Georgia, including, but not limited to, for each month (or quarter) and year since January 1, 2006, the identity of each person in the State of Georgia that McKesson Corp. distributed the oxycodone to, and the quantity of oxycodone that McKesson Corp. distributed to that person (in dosage units and grams).

A copy of the plaintiff's letter dated February 5, 2013, is attached as Exhibit C.

4

10. By letter, dated February 20, 2013, DEA acknowledged receipt of plaintiff's request, informing him that his request was assigned DEA FOIA Request No. 13-00233-F, and that his request would be handled in chronological order based on the date of his letter. A copy of the DEA letter dated February 20, 2013, is attached as Exhibit D.

11. By letter, dated May 16, 2013, referencing request 13-00233, DEA informed plaintiff that the fees to process his request would be $3,434.00. The letter also informed plaintiff that "Even upon receipt of all processing fees, the Drug Enforcement Administration (DEA) cannot guarantee that any documents will be made available to you under the Freedom of Information/Privacy Act (FOI/PA)." A copy of DEA's May 16, 2013, letter is attached as Exhibit E.

12. By letter, dated May 21, 2013, referencing request 13-00105-F, DEA informed plaintiff of the fees for processing his request would be $3,362.00. The letter also informed plaintiff that "Even upon receipt of all processing fees, the Drug Enforcement Administration (DEA) cannot guarantee that any documents will be made available to you under the Freedom of Information/Privacy Act (FOI/PA)." A copy of DEA's May 21, 2013, letter is attached as Exhibit F.

13. Via Federal Express, plaintiff sent DEA a letter referencing 13-00233 and enclosed a check for $3,434. A copy of the plaintiff's letter, dated June 11, 2013, is attached as Exhibit G.

5

14. Via Federal Express, plaintiff sent DEA a letter referencing 13-00105-F and enclosed a check $3,362.00. A copy of the plaintiff's letter dated June 20, 2013, is attached as Exhibit H.

15. On July 3, 2013, DEA sent two letters, one referencing 13-00105-F, and one reference 13-00233-F, acknowledging receipt of both checks sent by plaintiff, and informing plaintiff that unusual circumstances applied to his request. This response letter was sent in error because no unusual circumstances applied to plaintiff's request. This was a form letter with standard language that should have been omitted from the form letter in this case. Copies of DEA's July 3, 2013 letters are attached as Exhibits I and J.

16. On August 12, 2013, plaintiff sent DEA a letter referencing 13-00105-F and 13-00233, claiming the process was taking too long and that if he was not provided the requested data on or before September 16, 2013 that he would be forced to take appropriate action in the federal courts. A copy of the plaintiff's letter dated August 12, 2013, is attached as Exhibit K.

17. It is DEA's standard practice to process requests in chronological order on a "first in, first out" basis, a practice consistent with the *Open America* decision. That practice was utilized in response to plaintiff's November and February requests. As of September 30, 2013, DEA had a backlog in excess of 373 administrative cases in a single processing track.

18. On October 15, 2013, plaintiff filed the present action in the United States District Court for the District of Minnesota.

19. By letter, dated December 19, 2013, DEA released to the plaintiff a compact disk (CD) containing reports 2, 3, 4, 5, and 7 from DEA's Automated Records and Consolidated Orders System related to plaintiff's request 13-00105-F. (*Paragraph 5.d. above*) Plaintiff was also informed that pursuant to 28 CFR §16.8, DEA would need to provide notice to third party companies who submitted business information and allow them a reasonable time to object to disclosure. A copy of the DEA letter dated December 19, 2013, is attached as Exhibit L.

20. In a final determination letter, dated January 23, 2014, DEA informed the plaintiff, through plaintiff's counsel, that the remaining portions of plaintiff's 13-00105-F and 13-00233-F requests were denied pursuant to the FOIA exemption (b)(4), as containing confidential, commercial information. Plaintiff was also informed that no information was located pursuant to report #6, and to CVS Caremark. A copy of DEA's second letter dated January 23, 2014, is attached as Exhibit M.

## SEARCH PROCESS

21. Any records deemed responsive to plaintiff's direct FOIA request are contained or maintained in the DEA Automated Records and Consolidated Orders System - Diversion Analysis and Detection System (ARCOS-DADS) (Hereinafter, ARCOS). Thus, based on

7

plaintiff's request, no other record system maintained by DEA, other than ARCOS, was reasonably likely to contain records responsive to plaintiff's request.

22. DEA construed the plaintiff's request as a demand for information regarding third parties, specifically information maintained by DEA contained in ARCOS. This system of records is maintained pursuant to the reporting requirements of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 827(d)) and to fulfill the United States treaty obligations under the Single Convention on Narcotic Drugs and the Convention on Psychotropic Substances of 1971. This system is used to track and report the transfer of pharmaceuticals and to detect potential diversion.

23. ARCOS, JUSTICE/DEA-003, is the DEA system of records that consists of documentation of individual business transactions between individuals who handle controlled substances at every level, from manufacturers or distributors down to the point of sale to the retail ultimate level registrant (e.g., pharmacies, hospitals, practitioners, researchers, importers/exporters, etc.). Records include copies of controlled substances inventories, drug codes, deletion and adjustment reports, receipts, purchase orders, and prescriptions, and include the date of the transaction, the name, quantity, and quality of the chemicals/substances purchased or dispensed, the parties to the transaction, and the DEA registrant numbers. This information provides an audit trail of all manufactured and/or imported controlled substances. ARCOS is a Privacy Act System of Records.

The system was recently reported at 69 Federal Register 51104 and modified at 72 Federal Register 3410.

24. The information submitted to ARCOS is gathered pursuant to DEA's law enforcement responsibility, which is the enforcement of Federal drug laws, including the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801, *et seq*). DEA does not make ARCOS information generally available to the public.

25. Approximately 1,100 manufacturers and distributors of bulk and/or dosage form controlled substances must report inventories, acquisitions, and dispositions of all substances in schedules I, II, and III narcotics and Gamma-Hydroxybutyric Acid (GBH) in schedule III. Just under 70.9 million transactions were reported to ARCOS in 2010.

26. The Attorney General has exempted this system from subsections (c)(3) and (d) of the Privacy Act pursuant to 5 U.S.C. 552a(k)(2). These exemptions are codified at 28 CFR §16.98.

27. The ARCOS reporting provisions are set forth in 21 C.F.R. §1304.33. This regulation requires distributors of controlled substances in schedules I and II, and narcotic controlled substances in schedule III, and gamma-hydroxybutyric acid drug product controlled substances in Schedule III, to report to DEA all acquisitions and distributions of such materials.

28. Plaintiff requested information pertaining to oxycodone distribution in the State of Georgia. Oxycodone is a Schedule II narcotic. In addition, plaintiff requested ARCOS

9

reports 1, 2, 3, 4, 5, 6, and 7. Plaintiff indicated in both his requests that the data requested resided in the ARCOS database. SARF reviewed both requests and interpreted them as seeking information from within the ARCOS database. Based on the plaintiff's requests for records pertaining to the distribution of oxycodone, SARF concluded there was no other location where responsive data was likely to be found.

29. SARF identified the DEA Office of Diversion Control (ODC), which oversees ARCOS, as the office with the expertise and knowledge of ARCOS. SARF contacted the Section Chief and Associate Section Chief of the Pharmaceutical Investigations Section (ODP) to identify the specific DEA personnel who would likely possess responsive information. The Chief, Targeting & Analysis Unit (ODPT), Office of Diversion Control, then conducted a query using the parameters provided in plaintiff's requests (e.g., date range, name of distributor, drug type, and geographic region). ODPT also searched for the requested ARCOS reports in the ARCOS database. The search was done from a desktop, and the information is stored at DEA Headquarters. The responsive data was provided to SARF.

30. The searches resulted in the identification of potentially responsive records, including records pertaining to four of the five requested companies, as well as reports numbers 1, 2, 3, 4, 5, and 7. SARF segregated these records for further processing. OCD found no information related to CVS Caremark's distribution of oxycodone in Georgia in the specified time frame. Also, OCD concluded that report no. 6 was never used or

published, and there was no information (either in draft or final form) to provide in response to the request for report no. 6.

## JUSTIFICATION FOR WITHHOLDING

31. DEA withheld major portions of the requested data under FOIA exemption 4 for commercial or financial information obtained from a person that is privileged or confidential. 5 U.S.C. §552 (b)(4).

32. The FOIA, 5 U.S.C. §552 (b)(4) sets forth an exemption to protect trade secrets and commercial or financial information obtained from a person that is privileged or confidential. This exemption is intended to protect the interests of both the government and submitters of information.

## REQUESTED RECORDS PERTAINING TO WALGREENS, MCKESSEN, AMERISOURCE BERGEN, AND CARDINAL HEALTH

33. The information requested pertaining to the remaining four private companies' distribution of oxycodone to persons located in the State of Georgia were withheld pursuant to Exemption (b)(4). The companies submitted this information to DEA under compulsion of law pursuant to 21 U.S.C. §827 and 21 C.F.R. §1304.33.

34. The data was retreived from the ARCOS database in the form of a large spreadsheet of information. The column headings are identical for each of the four companies, and these headings include: Supplier Name, Supplier County, Supplier City, Supplier State, Supplier Zip, Supplier Business Activity, Buyer Name, Buyer County, Buyer City, Buyer

State, Buyer Zip, Drug, Transaction Date, Total Dosage Units, and Total Grams. The data retrieved specific to the four companies contains thousands and thousands of lines of repetitive data: company one's information has 314,083 lines of data; company two's information contains 681,114 lines of data; company three's information contains 692,447 lines of data; and company four's information contains 246,041 lines of data.

35. Upon review of this information, SARF determined that it contained potential commercial and financial information that is confidential and that could be subject to FOIA exemption b(4).

36. As required by 28 CFR §16.8, I informed all the relevant submitters of the plaintiff's FOIA request and allowed them an opportunity to object to any disclosure.

37. All four companies objected to the disclosure by DEA of its commercial and financial information provided to DEA, and all four companies confirmed that information shared with DEA is not information customarily released to the public.

38. The companies indicated that the responsive material consists of sensitive and confidential business information about their market share in a specific geographical area, and estimates inventory levels and corresponding sales, which would cause substantial competitive harm to all four companies if released. Also, the companies indicated that their business partners do not want their sensitive business information made publicly available.

39. In addition, the companies articulated the competitive harm that would result from the release of their non-public information. The objections raised by the companies indicate that the disclosure of the information contained the ARCOS reports could be used by competitors to gain a competitive advantage over them. The dosage units and total grams purchased in combination with buyer information can be used to estimate inventory levels and corresponding sales at a particular registered location, which can in turn be used to determine market share and sales trends in a particular area. As pointed out by one of the companies, if competitors were to obtain such data, they would be able to use it to target specific markets, forecast potential business of new locations, or to gain market share in existing locations. Two companies pointed out that this information could be used by entities to circumvent anti-diversion measures that they have in place.

40. Once I received all the responses, SARF made a final determination that the material would be withheld in its entirety under exemption (b)(4). This determination was based on the following facts and circumstances: (1) the responses received from the submitters indicated that the information should be withheld, (2) the data was provided to DEA by private companies under compulsion of law, (3) the data consisted of commercial information, (4) the data is kept confidential by the DEA and by the submitters, and (5) the release of the information would result in substantial competitive harm to the submitters. A final determination letter was sent to plaintiff on January 23, 2013 indicating this decision (Exhibit M).

## ARCOS REPORT NUMBER 1

41. The information related to report number 1 was also withheld under FOIA exemption 4 for commercial or financial information obtained from a person that is privileged or confidential. 5 U.S.C. §552 (b)(4).

42. Report 1 provides quarterly and annual total drug amounts distributed to individual retail registrants by three digit zip codes. Report #1 breaks down by drug code (for example, Schedule I & II materials from manufacturers and distributors) and by three digit zip code for every state, the District of Columbia, and US territories (Guam, American Samoa, Puerto Rico, and the U.S. Virgin Islands). Report 1 includes information pertaining to over 1,260 active registrants and is based on information registrants are required to submit under compulsion of law.

43. Report 2 reflects the total drug quantity distributed to retail registrants quarterly by state. Report 3 reflects quarterly drug totals distributed to each state per 100k population. Report 4 reflects yearly drug totals distributed to each state per 100k population. For each drug, the states are listed in ranking order. Report 5 lists the number of registrants, total amounts sold, and average purchases of each drug, for each business activity, in each state. Report 7 lists the number of registrants, total amounts sold, and average purchases of each drug, for each business activity, within the entire United States.

44. All the reports related to plaintiff's request, except report #1, list total amounts sold or distributed in a state or for the entire United States. Thus, the information is so diluted

that it does not reveal any particular registrant's market share or any other competitive confidential information. Therefore, SARF determined that those reports are not subject to any FOIA exemption and they were released to plaintiff.

45. In contrast, SARF determined that report no. 1 would be withheld under exemption (b)(4) based on the following facts and circumstances: (1) Report 1 contains business information provided by private companies under compulsion of law; (2) Report 1 is used for investigatory purposes and, other than government agencies, this information is typically not shared outside of DEA; and (3) Report 1 provides commercial information that is traceable to an individual submitter, including the submitter's market share in a specific geographical area, as well as estimates of inventory levels and corresponding sales, which would cause substantial competitive harm to a potentially a large number of companies that distribute to retail registrants. The information could reveal registrants whose activities are voluminous enough in one or more ARCOS reportable controlled substances that the registrants could be identified. If competitors were to obtain such data, they would be able to use it to target specific markets, forecast potential business of new locations, or gain market share in existing locations.

46. SARF did not provide notice to the submitters of business information for Report 1. Due to the fact that there are over 1,260 active participating registrants who currently report to ARCOS, and that information is incorporated into Report 1, the number of

15

submitters is too voluminous to attempt to reach out to them and provide the submitters with a reasonable opportunity to object to disclosure of the requested information.

## THERE IS NO REASONABLY SEGREGABLE INFORMATION THAT CAN BE PRODUCED

47. SARF examined all withheld information to determine whether any reasonably segregable information could be released after applying the exemption to each record while considering the foreseeable harm that release would pose to interests protected by such exemptions. SARF concluded there was no reasonably segregable information to produce.

48. The information requested for the data regarding the four companies' distribution of oxycodone to persons located in the State of Georgia is inextricably intertwined with the requested information in report no. 1. Those documents together, when examined in reference to one another, clearly release commercial and financial information protected by FOIA exemption (b)(4), because the information is commercial and confidential, as described above, and the information reveals market share and other business practices that would result in substantial competitive harm.

49. SARF considered whether the spreadsheets relating to the four private companies could be redacted and produced. SARF concluded that substantial redaction would be required to obscure the information that reveals the individual submitter in connection with its confidential commercial information (the disclosure of which would lead to the

competitive harm). Given the plaintiff's request for data associated with individual submitters, this redaction would result in the records being non-responsive to plaintiff's requests and of no informational value. SARF concluded that a similar problem existed for report no. 1; the required substantial redaction would result in the report containing no information value. In addition, the burden of redacting thousands and thousands of lines of data would be onerous but would result in minimal, if any, value to the plaintiff.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Arlington, Virginia, this 6th day of February, 2014.

*Katherine L Myrick*
KATHERINE L. MYRICK
Chief, FOI/Privacy Act Unit
FOI/Records Management Section
Drug Enforcement Administration
Washington, D.C. 20537

17